[Civ. No. 16659. First Dist., Div. Two. Feb. 27, 1956.]

JOSEPH BARBARIA, Appellant, v. INDEPENDENT ELEVATOR COMPANY, INC. (a Corporation) et al., Respondents.

Chauncey McKeever for Appellant.

Dana, Bledsoe & Smith, Joseph W. Rogers, Jr., Barfield & Barfield and Daniel J. O'Brien for Respondents.

KAUFMAN, J.—Plaintiff appealed from a judgment entered on September 8, 1954, in favor of defendants Atwell, Vogel and Sterling, Inc., and Pat Keane and from an order denying plaintiff's motion for entry of default against defendants Independent Elevator Company and B. C. Van Emon Elevators, Inc., in an action for personal injuries caused by the fall of an elevator. A motion by respondents Independent Elevator Company and B. C. Van Emon Elevators, Inc. to dismiss the appeal from the order denying the motion for entry of default was granted by this court on June 15, 1955. (*Barbaria* v. *Independent Elevator Co.,* 133 Cal.App.2d 657 [285 P.2d 91].)

The complaint alleged negligence of respondents B. C. Van Emon Elevators, Inc. in the repair, maintenance and adjustment of the elevator, rendering it unsafe for use, and negligence of Atwell, Vogel and Sterling, Inc. in making inspections

of said elevator and reporting deviations from safety regulations of the State of California. It was alleged that Haslitt Warehouse Company, appellant's employer, had employed Atwell, Vogel and Sterling, Inc. to make these inspections and to inform said Warehouse Company of any condition that might impair the safety of the elevator. The accident herein occurred on February 6, 1953, and it was alleged that one of the inspections was made on May 15, 1952, that the elevator was then in a dangerous and defective condition which would have been discovered if a proper inspection had been made by Pat Keane, the inspector employed by Atwell, Vogel and Sterling, Inc., who is also a respondent herein.

The first trial of this action resulted in a jury verdict for plaintiff against defendants Atwell, Vogel and Sterling, Inc. and Pat Keane, and for defendants Independent Elevator Company and B. C. Van Emon Elevators, Inc., and against plaintiff. That judgment was entered on June 2, 1954. The losing defendants moved for a new trial, which was granted on July 1, 1954, on the grounds of excessive damages, insufficiency of the evidence to justify the verdict, that it was against law, and error in law occurring at the trial. No appeal was taken from that order.

Plaintiff moved for a new trial, addressing the notice to defendants Independent Elevator Company, Inc., B. C. Van Emon Elevators, Inc. and their attorneys, asking that the court set aside that part of the verdict rendered against plaintiff and in favor of the two above named defendants. The court, on July 26, 1954, denied the motion to vacate "and set aside that part of the verdict heretofore rendered in this action against plaintiff and in favor of defendants, Independent Elevator Company, Inc. and B. C. Van Emon Elevators, Inc., and the judgment entered thereon, and to grant a new trial."

Respondents Independent Elevator Company, Inc. and B. C. Van Emon Elevators, Inc. have filed a brief, arguing that the dismissal of the appeal from the order denying plaintiff's motion to enter the default of these defendants removed all vestige of appeal against them. The rule is stated in 3 Witkin, California Procedure, 2081, section 833, that "where the rights and interests of the defendants are distinct and the judgment is severable, a motion by one and resulting order will not affect the judgment against the others." (See *Robson* v. *Superior Court*, 171 Cal. 588, 594 [154 P. 8]; *Fowden* v. *Pacific Coast S. S. Co.*, 149 Cal. 151, 155 [86 P. 178]; *Fearon* v.

*Fodera,* 169 Cal. 370, 376 [148 P. 200, Ann.Cas. 1916D 312].) In *Hoffman* v. *Lane,* 11 Cal.App.2d 655, 661 [54 P.2d 477], it was said that ''The granting of a new trial as to one of several independent tort-feasors, found jointly liable for negligence, does not vacate the judgment against the remainder.'' It is further stated that if ''the rights and liabilities of the codefendants are interdependent or those of one are entirely dependent on the other'' if the judgment is vacated as to one it is also vacated as to the other. Appellant's complaint herein alleged that he did not know whether some or all defendants were liable to him nor to what extent.

Undoubtedly, in this case the rights and interests of defendants were distinct and severable. It was clearly the intention of the trial court, as noted in *Barbaria* v. *Independent Elevator Co., supra,* to grant a new trial as to the losing defendants and leave the verdict intact as to the winning defendants.

The only appeal, therefore, now pending before this court is that set forth in appellant's notice of appeal, ''from the judgment . . . on September 8, 1954 in favor of defendants, Atwell, Vogel and Sterling, Inc. and Pat Keane.'' The judgment entered on the directed verdict includes no other defendants, and there was, of course, no evidence offered at the second trial touching the liability of these defendants and respondents. Appellant did not resist the motion for directed verdict on the ground that other issues or other parties were involved, and did not challenge the verdict on the ground that it was incomplete. Consequently, he must be held to have waived any objection thereto. (*Brown* v. *Regan,* 10 Cal.2d 519, 523 [75 P.2d 1063]; *Joerger* v. *Pacific Gas & Elec. Co.,* 207 Cal. 8, 21 [276 P. 1017]; *Kirby* v. *Adcock,* 116 Cal.App.2d 570, 571 [253 P.2d 700].)

Appellant Barbaria, an employee of Haslitt Warehouse Company in San Francisco, claims to have suffered an inguinal hernia when the freight elevator he was operating went out of his control and crashed at the bottom of the elevator shaft. His employer, Haslitt, was insured for workmen's compensation and public liability by the California Casualty Indemnity Exchange. The latter company employed Atwell, Vogel and Sterling, Inc. to inspect Haslitt's elevators at yearly intervals. Pat Keane, an employee of Atwell, inspected the elevators in May of 1950, 1951 and 1952. His reports were sent by Atwell to California Casualty, but none was ever

sent to Haslitt. Don Haslitt, vice-president and secretary of the warehouse company, said that he knew his elevators were inspected by the state and by California Casualty, and that he expected to be notified if anything dangerous was discovered. On cross-examination he stated that in the years gone by, California Casualty had billed them using itemized invoices and that elevator inspection was set forth as an item. He said that he had looked for these earlier records but could not find them, as they were periodically destroyed. Workmen's compensation policies, he thought, were kept only for three or four years back. He was not questioned about the current billing practice. Respondents concede that undoubtedly, California Casualty passed on to the insured, elevator inspection costs as part of its overhead costs in issuing an insurance policy.

Permits for elevator operation are issued annually by the Division of Industrial Safety of the California Department of Industrial Relations. Permits are based on reports of state inspectors. These are a few full time state elevator inspectors, but most of them are specially certified by the state and must be employed as elevator inspectors by an insurance company or an organization of the type of Atwell herein which inspect elevators for insurance companies. Respondent Pat Keane, employed by Atwell, inspected the elevators on behalf of the state in November of 1950, 1951 and 1952, after which the annual permits were issued. In May of each of these years he performed the annual inspections required by California Casualty as noted above.

The complaint herein, it will be recalled, alleged that Haslitt Warehouse Company *employed* Atwell to make inspections, to report deviations from state safety regulations and to inform Haslitt of any condition that might impair the safety of the elevator; that in pursuance of said employment defendant would make regular inspections; that one such inspection was made on May 15, 1952, which was so negligently made that the dangerous condition which subsequently caused the accident, was not discovered or reported to the state or to Haslitt.

The insurance policies were not produced in evidence by appellant. They would undoubtedly be the best evidence of the contract between appellant and California Casualty. Respondents do not have them in their possession and state that they are willing to stipulate that an application by appellant to produce them as additional evidence in accordance with

rule 23(b), Rules on Appeal, be granted. There was evidence of a contract between California Casualty and Atwell. There was no evidence of any contractual relation between appellant's employer Haslitt and respondents Atwell or Keane.

The freight elevator involved in the accident had a rated capacity of 4,000 pounds. The load on the elevator at the time of the accident was in excess of the rated capacity, having on board a fork lift weighing 3,970 pounds, two employees of Haslitt, appellant and a Mr. Oldano, and steel plates that had been built into the floor in 1949 or 1950, which weighed 600 to 640 pounds. The elevator operated at two speeds "half" or slow and "full" or fast. There is no evidence in feet per minute of travel as to either of these speeds. The "governor tripping speed" was 210 feet per minute. The control lever had five positions, the center one for "neutral" or "stop," the two positions on both right and left, for half and full speed up and half and full speed down. On each floor in the hallway were constant pressure buttons by which the elevator could be brought from one floor to another. These buttons operated as switches. When these buttons were pressed the car operated at full speed. The pressure of such a button by a person in the hall took control from the operator and made the car switches ineffective. If the operator in the car was descending at half speed when a button was pressed on a floor below, the car would descend at full speed.

Appellant and Oldano put their load on the elevator at the fifth floor, intending to descend to the fourth. They had begun to proceed at half speed when the elevator accelerated. It descended until it crashed against the bottom of the shaft. Oldano said that it went "pretty fast," appellant testified that it was a "free fall." The safety switch and the "machine limit switch" ordinarily should have been effective to stop the elevator at its lower limit of travel before it hit the "bumpers" in the pit. There was no evidence that either of these switches was defective. Appellant testified that he reached for the safety switch but before he could pull it the elevator hit bottom. There was expert testimony that the fact that the machine limit switch failed to work would indicate that it was caused by the overload on the elevator.

The theory of both sides, as revealed by the testimony of their experts was that while the car was proceeding in slow speed a button was pushed on the first floor, causing the car to accelerate. The negligence which appellant contends proximately caused the accident, was failure of the inspector to

detect and report a defect in the governor. It is claimed that the governor failed to function properly, thus the speed of the car was not checked in time. There was no breakage of the cables in this case. Such breakage would cause a "free fall" as testified by appellant's expert, Garrett. This expert stated that if for any reason the car exceeds preset speeds, either by a runaway or breakage of the cables, the governor should operate to check the speed. The governor could not trip at a speed below 210 feet per minute, or 3½ feet per second.

The governor consists of a wheel with a grooved rim, mounted on an axle attached to a heavy iron base in the "penthouse" at the top of the shaft. The governor cable rides in the groove and is attached at one end to the top of the elevator. The other end is attached to a point below the car where it is connected to two safety devices. The motion of the rope is caused by the ascent and descent of the car. On either side of the wheel or sheave of the governor are two "pawls." When the car descends the wheel rotates in a counter-clockwise direction and the pawls "fan out" their ends extending beyond the rim of the wheel. The faster the wheel rotates, the further the pawls extend beyond the rim of the wheel.

Prior to 1947 the governor was designed so that it tripped when one of the pawls struck a raised portion of the base of the governor known as the "casting" or "rib" upon the expansion of the pawl when the speed passed the limit set. It was found through experience that there were times when this device had failed. The state, therefore, ordered all such governors converted by the attachment of a grip device or yoke. The pawls were then supposed to engage the yoke instead of the rib as formerly. The elevator herein was so converted. The expert, Garrett, an assistant safety engineer for the Division of Industrial Safety, demonstrated with the governor which was introduced into evidence, that it was possible that it might fail to function properly, and might on occasion engage the rib instead of the yoke. Garrett admitted that when the accident was investigated the governor appeared to have functioned properly as the yoke was then engaged and the safety devices at the bottom of the car had been actuated, a mark on the guide rails showing that they had begun to dig in to stop the car.

Garrett stated that he was at first at a loss to explain how the accident happened. Therefore he conjectured that although the governor physically gave the appearance of having

functioned, it may have engaged the rib instead of the yoke, and that the severe bounce then caused the rib to be disengaged and the yoke to become engaged. Although counsel tried to get him to state that this was probable, he would go no further than saying it was possible. Mr. Rodriguez, State Supervisor of the Elevator Section of the Division of Industrial Safety testified also that the theory propounded by Garrett was a possibility, that no other possible explanation could be found, and that was apparently what happened. At the time of the accident, he stated, the governor conformed to safety rules then in force.

The inspector, respondent Pat Keane, testified that the state had not ordered the ribs removed from this type of governor until after this accident, that it is still not considered a violation, but when they are found it is recommended that they come out. He demonstrated how he had tested the governor in making his inspection. Appellant states that Keane admitted that if he had noticed the obstruction (meaning the rib) he would have insisted that it be remedied. Keane, however, actually testified that if he had noticed *an* obstruction he would have insisted that it be remedied, and then made it clear that he did not consider the rib an obstruction, that this was "a legal governor."

It is suggested that Keane was negligent in not noting a change of rated capacity because of the steel plates being put in the floor of the car. However, all the testimony was that these were added at a time before Keane began inspecting this elevator, and that he therefore would not have been expected to have questioned this.

There was evidence that Haslitt had trouble with this elevator running past the first floor and into the pit in October 1952 and in January 1953. Each time an elevator repair company had been called in. There was no evidence that the inspector or Atwell had ever been notified of these occurrences.

It seems abundantly clear from the above review of the expert testimony concerning the governor on this elevator, that the state supervisor and the assistant safety engineer of the Elevator Section of the Division of Industrial Safety had no reason to suspect that this type of governor was rendered dangerous by failure to remove the rib or casting after its conversion to a yoke type governor. It was this very accident which caused them to theorize that this type

of conversion could possibly prove dangerous. How then can it be said that the inspector was negligent in approving this mechanism for safety? It is clear from the expert testimony herein that what happened, or rather what may have happened, in this case was a result that could not have been reasonably anticipated by the safety engineers at the dates on which the inspections were made. The inspector had met the standards which were then in force by the Industrial Safety Division at the time he performed his inspection. Negligence, as defined in the Restatement of the Law of Torts, section 282, is conduct "which falls below the standard established by law for the protection of others against unreasonable risk of harm." The rules of the Division of Industrial Safety established standards for inspection which the court could adopt as the standard of care to be applied in determining negligence. ■■ The court could therefore, as it did in this case, declare as a matter of law, that there was not sufficient evidence to go to the jury, for there was no evidence of negligence directly contributing to the cause of the accident on the part of the inspectors under the state inspection standards then in force.

Appellant in his reply brief does not attempt to answer respondents' analysis of the evidence, stating that only the trial judge's statement of his grounds for directing the verdict is the basis of the appeal. This, of course, is not true. ■■ If there is no substantial evidence in the records to support a verdict for the losing party, the directed verdict will stand, regardless of the trial judge's statement. The trial court here stated that it had decided there was not sufficient evidence to go before the jury and then added in explanation that there was no duty owed by Atwell or Keane to the Haslitt company. On appeal this court is not restricted to a consideration of the ground stated by the trial court. (*United Air Services, Ltd.* v. *Sampson*, 30 Cal.App.2d 135, 138 [86 P.2d 366].) Respondents' motion herein was based also on the ground that there was no evidence of negligence. ■■ Appellant relies upon section 311, Restatement of Torts, which states that when it is the business or profession of a person to give information upon which the bodily security of others depends, if false information is given, then such party is liable to the recipient of the information or to third parties to whom he should expect such information to be communicated or those put in peril by the action taken if reasonable care has not been used to ascertain the accuracy

of the information. Under the evidence, however, it may be said as a matter of law, that reasonable care had been used by the inspector.

 The complaint herein based the cause of action against Atwell entirely on the duty arising under the contract of employment between Atwell and appellant's employer Haslitt. There was a complete failure of proof as to the existence of any contract between those parties. The only contract proved was that between Atwell and California Casualty in regard to the inspections. Appellant apparently could, but did not, introduce the insurance contract between Haslitt and California Casualty. In cases where a third person has been held liable to the insured or to a third person because of negligent inspection of equipment, there was evidence that the insurance company had agreed with the owner to inspect, thus assuming the owner's duty to keep the equipment safe. (*Van Winkle* v. *American Steam-Boiler Ins. Co.*, 52 N.J.L. 240 [19 A. 472]; *Hartford Steam Boiler Inspection & Ins. Co.* v. *Pabst Brewing Co.*, 201 F. 617 [120 C.C.A. 45, Ann.Cas. 1915A 637]; *Bollin* v. *Elevator Const. & Repair Co.*, 361 Pa. 7 [63 A.2d 19].)

Although Haslitt, the employer, stated that he assumed he would be notified if anything was wrong, that is not evidence that the Atwell Company had agreed with him to take over his duty of keeping the elevator safe. In fact he regularly called in elevator repair companies when his employees reported anything wrong and there is no evidence that he communicated with Atwell or the inspector on any of these occasions.

Appellant cites *Lewis* v. *Terry*, 111 Cal. 39 [43 P. 398, 52 Am.St.Rep. 146, 31 L.R.A. 220], as a case in point, wherein it was held that there was a duty apart from the contract where there were misrepresentations involving risk of bodily harm. That was a case reversing a decision sustaining a demurrer without leave to amend, where there were allegations that the folding bed sold by the retailer was *known* by him to be defective, and in such case it was held there would be a duty owed to a person injured in using it, even though such person was not the purchaser. In the present case there is no allegation that the inspector knew of a dangerous condition and represented it as safe, but rather that because of his negligence he did not discover it.

There is language, it is true, in the case of *Dahms* v. *General*

*Elevator Co.,* 214 Cal. 733 [7 P.2d 1013], which lends support to appellant's theory. An elevator repair company, an independent contractor, was held liable to the operator when he was injured by the car falling to the bottom of the shaft. There was evidence that accident was caused by either the repairs being negligently made, *or* by the failure on inspection to discover certain defects. The court declared that defendant *as a matter of law* was chargeable with knowledge ''that in undertaking to repair an instrumentality such as an elevator, . . . any negligence on its part would cause injury to the operator of the car. . . . In such a case we think that defendant was under a duty to plaintiff to use ordinary care in the repair and inspection of the elevator.'' In that case, of course, the independent contractor had assumed the employer's duty to make the elevator safe for the employee or any passenger. If any substantial evidence had been offered in the present case of an undertaking on the part of Atwell of the employer's duty to keep the elevator safe, then, had negligence been shown, appellant would have been entitled to recover.

█ In regard to the duties of the inspector Keane in his capacity as a state officer, it may be said that the complaint has charged him only as ''an employee and servant'' of defendand Atwell. It appears well settled that public officers of this type, though employed and paid by a private employer, are nevertheless classified as public officers when performing the functions of their office. (See *Patton* v. *Board of Health,* 127 Cal. 388 [59 P. 702, 78 Am.St.Rep. 66]; *St. John* v. *Reid,* 17 Cal.App.2d 5 [61 P.2d 363]; *Maggi* v. *Pompa,* 105 Cal. App. 496 [287 P. 982].) No attempt was made to comply with section 1981, Government Code, requiring the filing of a verified written claim within 90 days after the accident. Although the complaint was filed within 90 days of the accident it was never served on Keane. The failure to comply with this section makes futile any attempt to now charge Keane in his capacity as a public officer. (*Ward* v. *Jones,* 39 Cal.2d 756 [249 P.2d 246]; *Veriddo* v. *Renaud,* 35 Cal.2d 263 [217 P.2d 647]; *Huffaker* v. *Decker,* 77 Cal.App.2d 383, 389 [175 P.2d 254].) The November reports which Keane made in his capacity as state inspector were turned in to the employer Atwell who evidently took care of forwarding them to the state. It is certainly a fair inference that Atwell received the benefit of this information and would act on it if necessary. If a duty had been proved on the part of Atwell

to advise appellant's employer, Haslitt, of any dangerous condition of the elevator which came to its attention through these reports, then Atwell could still be held, and the fact that it was a state officer through whom they received such information would not relieve said respondent of liability. However, there was no evidence that these reports contained such information. The claim is rather that they did not because the inspector negligently failed to find defects.

There is no evidence that respondent Atwell exercised any control over the inspector in the making of the state inspections, and his certificate entitling him to make such inspections could be revoked only at the instance of the state. (Lab. Code, § 7311.)

In view of the lack of substantial evidence to support a contrary verdict, it must be held that no error was committed in directing a verdict for respondents.

Judgment affirmed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied March 28, 1956, and appellant's petition for a hearing by the Supreme Court was denied April 25, 1956. Carter, J., was of the opinion that the petition should be granted.